JM:SC
F.#2010R00399

# M-11-683

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    -against-

DANIEL GREENBERG,

        Defendant.

- - - - - - - - - - - - - - - - - X

**TO BE FILED UNDER SEAL**

COMPLAINT & AFFIDAVIT IN
SUPPORT OF ARREST WARRANT

(18 U.S.C. § 1343)

EASTERN DISTRICT OF NEW YORK, SS:

      CHARLES D. SCHRIVER, being duly sworn, deposes and says that he is a Postal Inspector with the United States Postal Inspection Service, duly appointed according to law and acting as such.

      In or about and between June 2008 and December 2008, within the Eastern District of New York and elsewhere, the defendant DANIEL GREENBERG, having devised a scheme and artifice to defraud and to obtain money by means of materially false and fraudulent pretenses and representations, did knowingly and intentionally transmit and cause to be transmitted writings, signs, signals, pictures and sounds by means of wire communication in interstate and foreign commerce for the purpose of executing said scheme and artifice.

      (Title 18, United States Code, Section 1343)

        The source of your deponent's information and the
grounds for his belief are as follows:

        1.    I have been a Postal Inspector with the United
States Postal Inspection Service ("USPIS") for approximately 18
years.  The facts set forth in this affidavit are based in part
on information that I have learned from my review of written
documents prepared by, and conversations with, attorneys and
employees of the Federal Trade Commission (the "FTC") and from my
review of various documents obtained by subpoena, request or
database searches and interviews of witnesses.

        2.    Because this Affidavit is being submitted for the
limited purpose of seeking an arrest warrant, I have not set
forth each and every fact learned during the course of this
investigation, but simply those facts which I believe are
necessary to establish probable cause to support the issuance of
an arrest warrant for defendant DANIEL GREENBERG.

I.   Overview of the Scheme

        3.    From approximately June 2008 through at least
December 2008, defendant DANIEL GREENBERG, through his company
Classic Closeouts, LLC ("CCL"), an internet seller of discounted
clothing and personal items, engaged in an unlawful and
fraudulent scheme to charge customers' credit cards or debit
their bank accounts, without customers' authorization and without
customers purchasing any merchandise.  GREENBERG often charged

the accounts of unsuspecting customers multiple times over the course of several weeks and months, all without authorization. GREENBERG ignored aggrieved customers' calls, and voicemail and e-mail messages complaining about this fraudulent conduct.  To further his illicit scheme, when customers disputed the unauthorized charges with their credit card companies and banks, GREENBERG falsely asserted that the charges were valid because the customers had enrolled in an alleged "frequent shopper club," that he claimed required a one-time charge.  As a result of GREENBERG's false representations, customers' credit card companies and banks sometimes declined to issue credits despite customers' protests, and customers were forced to pay these fraudulent charges plus any late fees and interest that might have accrued.

4.  Most customer victims of CCL made small purchases of merchandise from CCL, often several years before becoming the unsuspecting targets of defendant DANIEL GREENBERG's scheme. Most of the victim-customers were unaware that CCL had retained their credit card information once their transaction had ended, nor did they intend for that to happen.  Notably, a number of the credit card accounts that GREENBERG charged had in fact been closed, expired, or were rarely used.

II.  <u>The Defendant and Classic Closeouts, LLC</u>

      5.  Defendant DANIEL GREENBERG formed CCL as a Nevada limited liability company on April 30, 2002 and as a New York limited liability company on September 19, 2005.  (Both entities are collectively referred to as "CCL").  From approximately 2006 until 2009, CCL operated from 110 West Graham Avenue, Hempstead, New York.  Prior to that, CCL had offices in both Cedarhurst and Hewlett, New York.  According to former CCL employees, at the time relevant to this investigation, CCL employed approximately 30-40 people in its office and warehouse.  CCL maintained a web site, Classiccloseouts.com, from which it sold discounted clothing and related merchandise, typically for less than $20 per item.  The web site no longer exists.  GREENBERG abandoned CCL in 2009 and the company is no longer in business.

      6.  Defendant DANIEL GREENBERG was CCL's president, managing member, owner and was the sole signatory on CCL's accounts at Signature Bank.

III. <u>Victim Complaints</u>

      7.  Between June 2008 and January 2009, over one thousand customer victims filed complaints with the Federal Trade Commission ("FTC"), the Better Business Bureau of Metropolitan New York ("BBB"), the New York State Attorney General, other Attorneys General, and private organizations regarding these unauthorized charges.  For example, customer victims filed more

than 350 complaints of unauthorized charging with TRUSTe, an organization that certifies the privacy practices of their Internet licensees, and customers filed approximately 80 complaints with SHOP.com, an Internet shopping site where CCL marketed its merchandise.

8.   Customer #1's experience typifies that of defendant DANIEL GREENBERG's victims.   Customer #1 first noticed that there was an unauthorized charge by CCL of $69.99 on her credit card statement on June 30, 2008.   Thereafter, Customer #1 found two more unauthorized CCL charges, each for $79.99, on August 4, 2008 and August 29, 2008, for a total of $229 in unauthorized CCL charges.   Customer #1 stated that she did not receive an e-mail solicitation to join CCL's frequent shopper club, did not enroll in such a club, and, in fact, had only made one purchase of less than $50 worth of merchandise from CCL in 2004.   Customer #1 furthermore had never authorized CCL to retain her credit card information.

9.   Similarly, Customer #2 discovered three unauthorized charges of $69.99 each, during the period between July and August 2008.   Customer #2 stated that she did not receive an e-mail solicitation to join CCL's frequent shopper club, did not enroll in such a club, and, in fact, had only made one purchase of merchandise from CCL in 2005.   Customer #2

furthermore had never authorized CCL to retain her credit card
information.

10.   Once customers discovered the unauthorized charge,
or charges, they typically called CCL in order to have the
erroneous charge removed.  However, when customers called they
rarely were able to speak with a live representative and were
forced to leave several voicemail messages instead.  By and
large, no one at CCL returned the customers' calls.  Customers
also tried to contact CCL via e-mail at the "Contact Us" e-mail
address provided on the CCL web site.  Those e-mails typically
went unanswered, as well.  Because of CCL's failure to respond to
customers about the charges, customers were forced to dispute the
charges with their banks or credit card companies.

IV.   Federal Trade Commission

11.   On June 24, 2009, the FTC filed a civil action in
the Eastern District of New York seeking a Temporary Restraining
Order ("TRO") with asset freeze against defendant DANIEL
GREENBERG and CCL.  On June 29, 2009, after oral argument, the
Court entered the TRO and the asset freeze against CCL but denied
the asset freeze against GREENBERG based on his counsel's oral
representation that Greenberg required his assets to support his
family.  As part of the TRO, the Court appointed a temporary
receiver (the "Receiver") to prevent the destruction of documents
and the concealment or dissipation of CCL's assets.  The Receiver

was tasked with preserving records and making an accounting that would help identify GREENBERG's assets, determine the size and extent of the fraud, and identify the victims.

12. On October 9, 2009, the FTC sought a preliminary injunction against defendant DANIEL GREENBERG and his various companies. On October 26, 2009, the FTC entered into a stipulated preliminary injunction with GREENBERG. The Court entered a suspended judgment of $2,080,000 against GREENBERG who did not admit any liability. Also on October 26, 2009, the Court granted a preliminary injunction on default against CCL and GREENBERG's other companies.

V.    CCL Employee Interviews

Employee #1

13. During the course of my investigation, I interviewed Employee #1 who served as a computer programmer at CCL from August 2002 until August 2009. One of Employee #1's responsibilities was creating programs that facilitated customer access to the web site. Employee #1 said that the customer service department would typically alert him if there were problems with any of the programs and he would troubleshoot them. Employee #1 further stated that all of the programs he created for the web site had to be approved by defendant DANIEL GREENBERG before they were implemented.

14.   Employee #1 explained that when a customer purchased merchandise from the Classiccloseouts.com web site, all of the inputted information -- including name, credit card number and expiration, site password, shipping and billing address -- was saved in CCL's database.  The customer was not aware that this data had been saved, and did not specifically consent to the saving of such data when he or she made a purchase.  As far as Employee #1 was aware, only he, defendant DANIEL GREENBERG and Employee #4, the head of customer service, had access to the stored credit card information.

15.   Employee #1 said that CCL routinely e-mailed advertisements regarding sales and promotions to its customers.  According to Employee #1, a graphic designer in the computer department ("Employee #2") handled the graphics for all of the advertisements and would typically either receive a template from defendant DANIEL GREENBERG, or create the advertisement from scratch.  After Employee #2 completed the advertisement, she would send it to Employee #1 who would send it on to GREENBERG for approval.

16.   According to Employee #1, just before the summer of 2008, defendant DANIEL GREENBERG called him regarding a new promotion for a membership program that would give members free shipping.  Employee #1 said that Employee #2 was not notified about the promotion.

17. After the call, GREENBERG sent Employee #1 a template for a frequent shopper club via e-mail. According to Employee #1, the template displayed a picture of a woman and listed three or four different fees for membership. Using the template GREENBERG provided, Employee #1 created a customer checkout program that would charge a customer's credit card once the customer clicked on one of the "Join Now" icons on the promotion. Once the customer clicked on a "Join Now" icon, he or she would receive another e-mail as confirmation for having joined the frequent shopper club, this one displaying a man and the text "Congratulations." Employee #1 submitted the program to GREENBERG for approval.

18. Defendant DANIEL GREENBERG then asked Employee #1 to add another page to the program that would allow GREENBERG to access a customer's credit card information, as well as the ability to update that information. According to Employee #1, GREENBERG thus had the ability to charge customers' credit cards directly – either by updating or adding new customer credit card information, or charging their existing credit cards that were on file. GREENBERG further asked Employee #1 to provide him with access to view a report regarding customers who had enrolled in the frequent shopper club that should include information such as the customer's name, identification number, date of purchase and

membership cost.  According to Employee #1, only GREENBERG had
the ability to access the report.

19.  Employee #1 advised that credit card purchases for
CCL merchandise usually involved a two-step process: when the
customer clicked the purchase icon the funds were held for a few
days, a process called "delayed capture."  Next, the merchandise
would be shipped to the customer and an authorization number
would be used to charge the customer's credit card.  Employee #1
explained that because there was not any merchandise to be
shipped when a customer joined the frequent shopper club, the
credit card would be charged automatically when the customer
enrolled, or clicked on the "Join Now" icon.

20.  Employee #1 never learned whether the frequent
shopper club promotion was distributed to customers.  However, in
the summer of 2008, Employee #1 learned from Employee #4 that
numerous CCL customers were requesting refunds.  According to
Employee #1, the volume of customers seeking refunds was so great
that Employee #4, who was in charge of customer service, began
generating a spreadsheet that listed the customers requesting
refunds, along with their credit card and authorization numbers,
and would send this spreadsheet to defendant DANIEL GREENBERG on
a daily basis.  GREENBERG would then respond via e-mail to
Employee #4, while carbon copying Employee #1 on the e-mail,
indicating which customers should receive a refund.  Employee #1

would then refund the amount of the purchase based on the authorization number listed. When Employee #1 accessed the customer's account, he saw that no merchandise had been purchased in connection with the charge the customer sought to be refunded.

21. Employee #1 stated that he had created the program used on the CCL web site checkout page that charged a customer's credit card when merchandise was purchased, and that refunds were processed via the same program in conjunction with a credit card authorization number that was required to complete the refund. Because of the large number of customer requests for refunds in summer of 2008, he created a new program to handle the refunds -- particularly because the refunds were not connected to the purchase of merchandise and nothing tangible was being returned to CCL that could be scanned for a refund which was typically the practice. Eventually, according to Employee #1, he stopped receiving the spreadsheet listing customers seeking refunds because there were simply too many requests.

22. In July 2008, amidst all of the customer requests for refunds and after having seen a large volume of customer complaints on various internet shopping discussion boards, Employee #1 asked defendant DANIEL GREENBERG how many customers had joined the frequent shopper club and GREENBERG replied that "it was doing good." GREENBERG told him not to discuss the frequent shopper club with anyone. According to Employee #1,

information regarding promotions in process could typically be viewed by several employees in the computer and advertising departments but GREENBERG had not granted anyone else access to view information about the frequent shopper club.  Employee #1 stated that this was the only promotion he knew of that was handled in this manner.  GREENBERG never told Employee #1 that there were any problems or glitches with the frequent shopper club program.

   *Employee #2*

        23.   During the course of my investigation, I also interviewed Employee #2 who was employed as a graphic designer at CCL from the spring of 2005 until July 2009.  Employee #2's job responsibilities included creating templates and promotional materials for CCL merchandise.  Typically, defendant DANIEL GREENBERG would e-mail Employee #2 the content for the promotions he wanted to post on the CCL web site and she would create the accompanying graphics.  GREENBERG had to approve all of her work before it was posted on the web site.  CCL posted approximately three advertisements on its web site per week.

        24.   Employee #2 stated that she had either designed, or had knowledge of, all advertisements and promotions at CCL but had no knowledge of the frequent shopper club until she read complaints about it on internet shopping discussion boards.  When Employee #2 asked defendant DANIEL GREENBERG about the customer

complaints, he told her that there was a membership club that was having problems with credit card payments.  Employee #2 said that Employee #3, a part-time graphic designer, told her that GREENBERG had asked him to create the promotion for the frequent shopper club in the winter of 2008.  Employee #2 thought it was odd that GREENBERG had never mentioned the frequent shopper club to her before.

  25. Sometime after this conversation with defendant DANIEL GREENBERG, Employee #2 noticed an unauthorized CCL charge on her credit card for either $29.99 or $39.99.  Employee #2 confronted GREENBERG about the charge and he said that there was a problem with the frequent shopper club program, and reimbursed her the amount charged, either by check or cash.  Employee #2 stated that she had purchased merchandise from CCL in the past because of the employee discount and had used her credit card.

  *Employee #3*

  26. During the course of my investigation, I interviewed Employee #3 who was a part-time graphic designer with CCL.  Employee #3 stated that defendant DANIEL GREENBERG had called him during a weekend in the winter of 2008 to create an advertisement for the frequent shopper club.  GREENBERG advised Employee #3 to "keep [the project] between us" and not to tell Employee #2 about it.  GREENBERG provided all of the text for the advertisement, while Employee #3 supplied the graphics.  Employee

14

#3 submitted the advertisement to GREENBERG for approval.
GREENBERG paid him an extra $10 for his work on the
advertisement.

   *Employee #4*

         27.  During the course of my investigation, I
interviewed Employee #4 who was employed as the customer service
manager at CCL from 2007 until December 2008.  Prior to that
time, Employee #4 had worked for another one of defendant DANIEL
GREENBERG's companies that sold merchandise online.  At CCL,
Employee #4 maintained bank accounts, did bookkeeping and oversaw
the accounts payable to vendors.

         28.  In June 2008, Employee #4 saw that there was a
discrepancy on the site between what customers had purchased and
the amount due CCL in credit card charges.  The amount of funds
due the company exceeded the customer purchases.  Employee #4
said that it was very unusual to have a discrepancy and that the
figures usually matched.  Employee #4 checked the VeriSign part
of the web site where the credit card charges were processed and
saw numerous charges for the same amount, approximately $29.99
but no corresponding purchases by customers on the web site.
After bringing it to defendant DANIEL GREENBERG's attention on
June 18, GREENBERG stated in an e-mail to Employee #4 that he was
testing a program with Employee #1 and that the amounts should
not have been charged to the customers.  Employee #4 noticed the

same problem the next day, and GREENBERG told him he was trying to get the problem fixed.  Employee #4 repeatedly sent GREENBERG e-mails urging him to resolve the matter promptly, as customers were getting upset.

29.  Employee #4 stated that the problem persisted on a daily basis for two months.  In particular, Employee #4 saw the same or similar charges a number of times.  Defendant DANIEL GREENBERG had Employee #4 compile a spreadsheet of the discrepancies in charges on the web site.  The complaints increased to such a frequency that the customer service employees let them go to voicemail.  At one point, CCL had the security guard answer the telephone calls while customer service responded to e-mail complaints.  They used an e-mail template to respond to the numerous complaints.  Although GREENBERG told him it was a "computer glitch" and that the programmers were working on the problem, Employee #4 did not think it was possible that the problem was a computer error.

30.  According to Employee #4, complaints came in through different avenues: TRUSTe, the BBB, credit card companies and directly from the customers.  GREENBERG instructed him to provide refunds to the customers who complained through TRUSTe. At GREENBERG's direction, on July 2, Employee #4 advised TRUSTe that CCL had "a computer error that caused some customers' credit

cards to be charged" and that "a credit has been issued to all customers that informed us of an erroneous charge."

31.   GREENBERG never mentioned the frequent shopper club to Employee #4, and Employee #4, as customer service manager, felt that there would not have been such a club without him knowing about it.

VI.   Greenberg's Various Explanations

*TRUSTe*

32.   In June 2008, early in the scheme, TRUSTe and SHOP.com began receiving complaints about CCL's unauthorized billing and failure to respond to the aggrieved customers' calls and e-mails.   In June 2008, TRUSTe received 22 complaints from customers alleging that CCL had made unauthorized charges or debits to their credit cards or bank accounts.   On July 2, 2008, "Josh" from CCL, whom I know to be Employee #4, in an e-mail attributed the improper charges to a "computer error," and assured TRUSTe that the affected customers had received refunds. On July 17, TRUSTe's Director of Compliance (the "Director") was finally able to speak with GREENBERG.   During their telephone conversation, GREENBERG informed the Director that a "technical error had occurred shortly before the July 4 holiday weekend;" that the "technical error" that lasted "less than a minute" erroneously charged "fewer than 100 consumers;" that CCL caught the glitch and credited those customers who they could identify;

and, that CCL would address any other customers who complained.

33.  This explanation did not satisfy the Director for several reasons.  First, TRUSTe had initially begun receiving customer complaints on June 19, and typically there is a lag between the charge and the customer's discovery of the charge. Second, if only 100 customers had been affected, TRUSTe would expect to receive only 1-2 complaints.  When the Director asked for other information that would explain the high volume of customer complaints, defendant DANIEL GREENBERG then mentioned an e-mail offer CCL had sent to approximately 700,000 present and past customers.  The Director queried whether the e-mail offer caused the issue and asked that a copy of the e-mail offer, along with an official explanation of the error that could be provided to customers, be sent to TRUSTe.

34.  On July 18, 2008, "pursuant to our conversation yesterday," defendant DANIEL GREENBERG sent TRUSTe, via e-mail, two versions of "the email that went out to our customer base" inviting customers to become a member of CCL's frequent shopper club, along with a copy of the "confirmation page" customers receive after their enrollment is complete.[1]  GREENBERG noted that CCL had been offering this membership "for years at various times and in various formats" to its customers and that there

_____

[1] When shown printouts of the two promotions and confirmation page, Employee #3 stated that they were the promotions he had created at GREENBERG's request.

were "1000's of previous members that have gladly paid and renewed yearly for several years already." He went on to note, "This is just the first time we promoted it to all of our customers at once (over 650,000 customers), so that's why there is the overwhelming response." None of the employees of CCL that I interviewed had ever heard of such a promotion before the summer of 2008 when customer complaints poured in.

35.   After several more conversations with defendant DANIEL GREENBERG, and after what TRUSTe deemed to be an unsatisfactory response to their concerns, on August 26, 2008, TRUSTe terminated CCL from its program. By that time, TRUSTe had received 392 complaints about CCL since June 19.

*SHOP.com*

36.   Early in July 2008, when SHOP.com started receiving numerous complaints of unauthorized charges on customer credit cards, Employee #4 initially gave SHOP.com a similar explanation about "an isolated issue." When SHOP.com noted that unauthorized charges were a "big concern," it temporarily suspended CCL from SHOP.com on July 9, 2008. On July 10, 2008, defendant DANIEL GREENBERG sent an e-mail to his SHOP.com contact stating that "the customer service issues are being dealt with."

37.   By July 30, 2008, defendant DANIEL GREENBERG offered a new explanation to SHOP.com. In a letter to the president of SHOP.com, GREENBERG stated that customers had

affirmatively agreed to the charges when they responded to an
"email campaign to offer customers a promotion . . . for one
year." GREENBERG claimed that the customer response had been
"overwhelmingly positive" and downplayed the growing number of
complaints by stating "[t]here were some customers who have
contacted us that they were billed for this promotion and did not
recognize the charges." GREENBERG further claimed that when
customers contacted CCL's customer service center and received
information about the purported "frequent shoppers' club"
membership, many customers "re-opted in" while others who wanted
to cancel, were able to do so.

    *Tribul*

    38. On July 24, 2008, defendant DANIEL GREENBERG sent
an e-mail to Tribul, the sales agent that had liability for CCL's
account with its merchant processing provider. GREENBERG advised
Tribul that CCL had launched a "membership campaign" to offer
customers a better level of service and engender increased brand
loyalty. GREENBERG attached the same e-mails that he had
provided to TRUSTe that had purportedly gone out to its customers
offering membership in the club. According to GREENBERG, "the
basic offer is to get preferred rates on all of our products and
to get free shipping on all orders for one year." GREENBERG
stated that the promotion had received an "overwhelmingly

positive" response that explained the "big increase in dollars coming in."

      39.  According to defendant DANIEL GREENBERG, the "initial media blast" in May 2008, along with the "1000's of responses" resulted in "a huge influx of customer service inquiries into the offer." GREENBERG stated that "coincidentally" CCL's voicemail system "broke down" during the last weekend in May, and "crashed again" on July 9th. According to GREENBERG, "because the phones were down, customers became infuriated that they could not get through, and became more and more hostile in their complaints" and out of frustration and anger "just decided to chargeback and/or cancel the membership." Additionally, GREENBERG explained that because its processor withheld its funds during the week of July 14th, CCL was "advised to refrain from issuing credits until funds were forthcoming from the processor." He suggested that the "customers resorted to the chargeback" in anger at having not received a refund from CCL.

*Receiver*

      40.  On June 30, 2009, the Receiver questioned defendant DANIEL GREENBERG about the increase in charges to CCL customers between June 2008 and December 2008. GREENBERG told the Receiver that he and CCL had developed CCL's own software program pursuant to which CCL e-mailed offers to past CCL customers to join its gold and platinum buying programs. He

stated that the solicitation was not in connection with any purchase of merchandise by the customer, and that by merely clicking on the e-mail, customers opted into the program and agreed to have their credit cards charged.  GREENBERG stated that the charges were assessed for the right to receive e-mail notices of sales and free delivery of goods, and that the e-mails had emanated from CCL's office at 110 West Graham Avenue.  He also stated that he was not aware of any documentation, electronic or otherwise, concerning the e-mail promotion.  The Receiver did not find his explanation reasonable or credible.

VII.   The Credit Card Process

41.   When customers disputed the fraudulent CCL charges with the bank that issued their credit card (the "issuing bank"), the issuing bank typically issued customers a conditional credit while it investigated the dispute.  At that point, the issuing bank would issue a "chargeback" - whereby the amount in question is charged back to the merchant's bank account.  In response to a chargeback from a customer's issuing bank, defendant DANIEL GREENBERG often responded to the issuing bank or CCL's own merchant processing provider in writing, falsely claiming that the transaction was valid, and that the customer had joined CCL's frequent shopper club which required a one-time charge. GREENBERG used this excuse despite the fact that he charged many of the customers' cards three or four times -- essentially, until

the customer cancelled the card.  Furthermore, many of the customers were the exact opposite of _frequent_ shoppers in that they had purchased from CCL on only one occasion, sometimes years before, buying an item or items of merchandise that was less than the cost of enrollment in the alleged frequent shopper club. Indeed, GREENBERG even offered this explanation for charges to customers who were dissatisfied with their initial purchase, requested a refund, and never made an additional purchase. Significantly, not a single customer who filed a complaint ever received an e-mail offer from CCL, or anyone else, to join CCL's frequent shopper club.

42.  Relying on the defendant DANIEL GREENBERG's false representations about the charges, the issuing banks often reversed the conditional credit on the customers' credit card statement or bank accounts (a process known as a "reversal") and demanded payment, although many, but not all, customers were eventually able to have these credits placed on their accounts again after submitting fraud affidavits.  In addition to being liable for the false, unauthorized charges, customers also found themselves liable for any late fees and penalties that accrued during the investigation period.  Accordingly, the only way customers were able to stop GREENBERG from continuing to make the unauthorized charges was often to close the account in question. For example, Customer #3 first noticed an unauthorized CCL charge

in December 2008.  When she reviewed earlier credit card statements, Customer #3 found that CCL had placed unauthorized charges on her credit card on: July 1, 2008 ($69.99), August 4, 2008 ($79.99) and August 29, 2008 ($79.99) for a total of four unauthorized charges of $308.99 on her account.  Because Customer #3 had not noticed the charges earlier, and thus, did not close her account at that time, GREENBERG made an additional unauthorized charge on her account in December 2008.  At that point, after she discovered these charges, Customer #3 also closed her credit card account to halt the unauthorized charges.

*Cynergy Data, LLC*

43.  During the course of my investigation, I interviewed the Risk Manager who oversaw CCL's account for Cynergy Data, LLC ("Cynergy"), CCL's merchant processing provider for Visa and MasterCard charges.  A merchant processing provider is a third-party processor who provides a terminal so that a merchant, like CCL, can process Visa and MasterCard charges.  All merchants sign a merchant processing agreement with the merchant processing provider and establish a fee schedule that may include a rolling reserve, which is an amount of money set in reserve by the merchant processing provider to offset chargebacks incurred by the merchant.

44.  At the end of each business day, all of the merchant's credit card transactions are "batched" in that the

terminal closes out all of the transactions for the day and transmits them in a "batch" to the merchant processing provider. The merchant processing provider reviews the information and then deposits the funds, less the fees, into the merchant's bank account.

45. According to the Risk Manager, in June 2008 she noticed an increased in CCL's monthly volume of transactions.[2] Cynergy placed a hold on CCL's batches -- in that it held the funds due to be deposited into the merchant's bank accounts -- and requested further information to support the increased volume of charges. CCL provided to Cynergy false documentation to justify the increase. Satisfied with the invoices, Cynergy released the batch for processing.

46. The Risk Manager said that a few weeks later a large number of chargebacks began to appear on the CCL account and a batch was held for a second time. Cynergy contacted CCL regarding the chargebacks. The Risk Manager was contacted by Tribul, the sales agent that brought CCL and Cynergy together and that had accepted liability for CCL's account. The Tribul representative advised the Risk Manager that the increase in sales was related to a membership campaign that had been offered

---

[2] According to the Risk Manager, in May 2008 CCL had 1,894 sales totaling $82,510.21; in June 2008 the sales jumped in number to 9,889 totaling $567,609.73; in July 2008 sales rose in number to 26,057 totaling $1,892,112.80; and in August 2008 sales hit their peak number of 27,058 totaling $1,876,859.77.

to CCL's existing clients. Because Tribul had accepted liability
for CCL, Cynergy released the batch and continued to process the
charges but did increase CCL's rolling reserve due to the high
number of chargebacks.

47.   In September 2008, Cynergy ceased processing
charges for CCL due to the excessive chargebacks.

48.   According to the Risk Manager, as per Visa and
MasterCard's rules, merchants are not permitted to store
customers' credit card information without the customer's
consent.  The Risk Manager stated that this prohibition is widely
known throughout the industry.

VIII.   Losses

49.   According to my analysis of records obtained from
Bank of America Merchant Services (the acquiring bank), Cynergy
and TSYS, the successor merchant processing provider to Cynergy,
and between mid-June 2008 and August 30, 2008, defendant DANIEL
GREENBERG placed approximately 65,679 unauthorized CCL charges
totaling $4,549,923.21 on customers' Visa and MasterCard credit
cards.

50.   During the same period, Visa and MasterCard
customers obtained approximately 39,372 chargebacks for a total
of $2,775,760.66.  GREENBERG was able to have 13,961 of those
chargebacks reversed, thus placing $983,899.24 of unauthorized
charges back on the customers' credit card statements.

51.   According to my analysis of records obtained from American Express, between mid-June 2008 and July 31, 2008, GREENBERG placed approximately 9,042 unauthorized CCL charges totaling $614,555 on customers' American Express cards.

52.   During the same period, American Express customers obtained approximately 5,092 chargebacks for a total of $349,713.24.

53.   On August 23, 2008, American Express referred the $96,980.03 balance owed by CCL to a debt collection agency, and terminated its relationship with CCL as of September 5, 2008.

54.   The Risk Manager estimated that CCL had issued approximately $620,000 worth of refunds for the unauthorized charges.

55.   Ultimately, Cynergy suffered a loss of approximately $1,018,000 because it reimbursed issuing banks for chargebacks that CCL failed to pay for.

IX.   Greenberg's Companies & Asset Transfers

*The Companies*

56.   In addition to CCL, defendant DANIEL GREENBERG owns numerous companies (collectively the "Companies"):

> A.   IVAL Group, LLC ("IVAL") - formed in March 2008 and provided credit card processing for purchases from Classiccloseouts.com after CCL lost Cynergy's services;

B.   AYC Holdings Corp. ("AYC") - another internet
seller of merchandise that also does business as
Dannysbargains.com and whose contact telephone
number listed on its web site is also CCL's
number;

C.   YGC Enterprises, Inc. ("YGC") - formed in March
2002 by GREENBERG and his spouse, and is the owner
of the Classiccloseouts.com trademark; and,

D.   110 West Graham Avenue Enterprises, Inc. ("110
West Graham") - formed in April 2006 and was the
leaseholder on the former CCL warehouse at 110
West Graham Avenue in Hempstead, NY.  CCL paid
"rent" to 110 West Graham in the amount of
approximately $240,000 from January through
October 2008.  Despite such large "rental"
payments, 110 West Graham is in arrears on its
payment of the lease, indicating that the funds
from CCL were not used for such payments.

All of the Companies were located at CCL's business premises, 110
West Graham Avenue in Hempstead, New York, and all have
maintained accounts at Signature Bank.  At his asset deposition
conducted by the FTC on March 2, 2010, GREENBERG stated that he
had abandoned all of the Companies and none were in business any
longer.

57. After Cynergy terminated CCL due to the overwhelming number of chargebacks, defendant DANIEL GREENBERG could no longer operate CCL in the same manner, so he transferred CCL's trademark to YGC, processed CCL's sales through IVAL, and used AYC, which links to IVAL's website, to sell merchandise and obtain customers' credit and debit card information. AYC used the same toll-free customer telephone number as CCL and answered its calls as "Classic Closeouts". In August 2008, during the time that CCL's unauthorized debiting was most flagrant, GREENBERG opened an account for IVAL at Signature Bank, and the IVAL account reflected sales revenues similar to CCL's sales revenues in the months prior to the summer of 2008.

58. GREENBERG stated to the Receiver that he transferred CCL's assets, including its web site, Classiccloseouts.com, to CCL Employee #5 (IVAL's "credit manager,") and Hazen (a company owned by Employee #5), but failed to produce evidence of, or consideration for, the purported transfer of CCL's assets. Later, Employee #5 provided a handwritten document to the FTC that he claimed was the contract for the transfer of CCL's assets.

*Asset Transfers*

59. The Receivership Accountants retrieved CCL's QuickBooks file, which ended in October 2008. Defendant DANIEL GREENBERG stated in his deposition during the FTC litigation that

he was the only one at CCL who handled accounting issues at an executive level, and that only he and Employee #4 worked with the QuickBooks file but that Employee #4 was only able to print out checks from the system and did not have password access to anything else.  The QuickBooks file revealed substantial transfers of revenues in 2008 by CCL to:

      --    AYC (totaling $1,180,190.55),

      --    defendant DANIEL GREENBERG (totaling $200,066.79),

      --    GREENBERG's spouse (totaling $19,500.00),

      --    Employee #5 (totaling $83,525.92),

      --    Hazen (totaling $161,470.95), and

      --    110 West Graham (totaling $241,014.67).

Furthermore, between October and December 2008, AYC bank account records show that CCL transferred an additional $85,000 to AYC and to other GREENBERG-owned or controlled accounts and entities.

      60.   The Receiver further noted that although AYC had received transfers totaling $1,180,190.55 from CCL into its Signature Bank account in July and August 2008, by February 2009 that account had been completely depleted by payments to GREENBERG's bank accounts in China ($200,000) and disbursements to 110 West Graham and IVAL, along with other entities he owned.

      61.   The Receiver further found that the CCL bank accounts had no funds, and was unable to take possession of any Receivership assets or business premises.  In addition, the FTC

and the Receiver found no corporate records for CCL at the
company's only known premises located at 110 West Graham Avenue,
Hempstead, New York.  When the Receiver contacted the CCL
accountants that defendant DANIEL GREENBERG had identified, those
accountants had nothing but payroll tax default notices.

Wherefore, it is respectfully requested that a warrant be issued for the defendant DANIEL GREENBERG so that he may be dealt with according to law.

*Charles D. Schriver*

Charles D. Schriver
Postal Inspector, USPIS

Sworn to before me this
5th day of July, 2011

ATE JUDGE
IEW YORK